**SOCONY-MOBIL OIL COMPANY,**
Incorporated

v.

**UNITED STATES.**

No. 686–53.

United States Court of Claims.
Decided June 8, 1960.

Laramore and Whitaker, JJ., dissented.

John W. Knox, New York City, for plaintiff.

Clare E. Walker, New York City, with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

MADDEN, Judge.

The agencies of the United States which have taken part in the transactions with which the instant case is concerned have been the United States Maritime Commission, the War Shipping Administration and the United States Maritime Administration. The name "Maritime" as used in this opinion designates whichever one of these agencies was the active one at the relevant time.

During World War II the plaintiff purchased from Maritime eight oil tankers which Maritime had caused to be built. At the time the title passed to the plaintiff, Maritime requisitioned the use of the tankers, as it was empowered to do by section 902 of the Merchant Marine Act of 1936, 46 U.S.C.A. § 1242. Thereafter the ships were operated by the plaintiff for the United States under a standardized form of time charter, the monthly charter hire paid by the United States being made up of (1) a stated amount for the use of the tankers and (2) a stated amount for the service to be rendered by the plaintiff, which service was the operation of the tankers by the plaintiff for the Government.

Section 902(a) of the 1936 Act referred to above provided that when the United States requisitioned the use of a ship, it should, when its need for the use ceased, restore the ship to the owner in a condition as good as when taken, less ordinary wear and tear, or should pay the owner an amount sufficient to restore the ship to that condition.

The charter agreement by which the plaintiff chartered the eight tankers to the Government provided that the Government had the right to install any equipment, gear or armament on the tankers, but that before redelivery of the tankers to the plaintiff, the Government would, at its own expense and "on

its time" remove such additions, and restore the ship to the condition it was in before the additions were made. The words "on its time" meant, of course, that the Government would continue to pay the "use" part of the charter hire during the time it took to restore the ships.

The charter agreement also provided that the Government, at its option, could, instead of itself restoring the tankers to their original condition, pay the plaintiff an amount of money sufficient to pay for the reconditioning and for the time reasonably required to perform the reconditioning, the time to be paid for at the agreed charter hire rate.

When hostilities ended in 1945, Maritime had on its hands a large number of ships under charter agreements like the one described above. It desired to terminate the charters and it reconditioned some of the ships for redelivery to the owners. But in the fall of 1945 it decided that it would be more economical and expeditious to make settlements with the owners, paying them an agreed sum of money and letting them make their own restorations. After discussion with the industry, Maritime submitted a draft form of a settlement plan, which, after further discussion and modification, became what was called the "Redelivery Program", dated November 2, 1945, and consisting of Plans I and II.

Plan I provided for immediate redelivery to the owner, with a lump sum payment to him for all his claims arising out of the charter, including, of course, compensation for the expense of making the restoration and for the disabling of the vessel from use during the time it would take to make the restoration. Plan I provided a formula for determining the lump sum payment. One factor was to include $50,000 if the degaussing system to be removed had been installed inside the hull, and $44,000 if it had been installed on the weather deck. In this factor would also be included special circumstances applicable to particular ships, such as wartime abuses by exces-

sive loadings, excessive speeds, convoy bumpings and undue deferment of repairs. The other factor was to be "an amount equal to fifteen days' full charter hire (use rate plus service rate)." In the negotiations the tanker owners asked for $70,000 for the restoration and 30 days' paid time, but the terms as first stated above were the ones finally agreed to.

The plaintiff elected to take back its ships under Plan I, and was paid $622,-552.55 on account of the eight ships in question. Of this sum $394,000 was allotted to the work of restoration, and the remaining $228,552.55 was the arithmetical computation of "an amount equal to fifteen full days' charter hire", as Plan I stipulated. Of this latter sum, $138,624.33 was "use" charter hire for 15 days, and the balance was "service" charter hire.

The release which the plaintiff executed upon receiving the lump sum payment was, of course, very comprehensive and, among many other things, released the Government from any obligation "to pay charter hire for any period of time required to make such repairs or restorations."

A paragraph of the Plan I agreement said:

"The acceptance by any owner of Plan I in the manner above prescribed shall constitute a compromise settlement agreement with the United States covering the claims released by the owner as above set forth * * *."

The charter agreement had provided that the "use rate" of hire was not subject to the Renegotiation Act of April 28, 1942, 56 Stat. 226, 245, as amended, 50 U.S.C.A.Appendix § 1191, but that the "service rate" was subject to renegotiation if it produced excess profits. Since the negotiation leading to the agreement on Plan I was, in effect, an adequate renegotiation, the parties, in order to foreclose further renegotiation, inserted in their redelivery settlement the following provision:

"Although the formula used in determining the amount of the lump sum settlement involves an element calculated at charter hire rates, it is the fact and intention of the parties that this lump sum settlement is not in payment of articles or services but is in discharge of certain claims under the charter."

The foregoing transactions were completed and the plaintiff got back its eight ships in November 1945. On March 8, 1946 Congress enacted the Merchant Ship Sales Act of 1946, 60 Stat. 41, 50 U.S.C.A.Appendix, §§ 1735 et seq., 1742. It did so because the Government still owned many merchant ships which it desired to sell into private ownership. The statute made detailed provision for the sale of the surplus ships at prices fixed by formulas, which prices would be fair to the Government but would attract purchasers. The only section of the Act relevant to the instant case is section 9. It provided, in effect, that any United States citizen who had purchased a ship from Maritime during World War II was entitled, if he applied for it, to an adjustment in the price paid for the ship so that its price would not exceed the price at which the same type of ship could be purchased from Maritime under the 1946 Act. Section 9(b) (6) of the Act said:

"The applicant shall credit the United States with all amounts paid by the Commission to him as charter hire for the use of the vessel (exclusive of service, if any, required under the terms of the charter) under any charter party made prior to the date of the enactment of this Act (March 8, 1946) * * *."

The plaintiff, in June 1946, applied for adjustment of the price of the eight tankers. The only controversy between the parties in working out the adjustment was with regard to the $138,624.33 which, as we have seen, had been included in the 1945 redelivery agreement as the "use" part of "an amount equal to fifteen days' full charter hire" at the rate fixed in the charter agreement.

Maritime claimed that the plaintiff was required by section 9(b) (6) to credit the Government with this sum. The plaintiff contended that the sum paid it in 1945 was not charter hire, but was merely a part of a lump sum compromise settlement of the rights of the parties under a complicated charter agreement. Maritime took the credit for the $138,624.33 and the plaintiff is suing to recover it.

The general purpose of section 9 of the 1946 Act was, of course, to put the owners of ships purchased from the Government during the war in the same position, as regards their capital invested in the ships, as those who purchased at the lower prices set by the 1946 Act. The ships, whether they had been sold by the Government during the war, as the plaintiff's ships had been, or had been retained by the Government and operated by it or for it, would have had the same amount of depreciation by age and by ordinary wear and tear. But wartime purchasers who had chartered their ships to the Government, had been paid, in the "use" portion of the charter hire, for the depreciation, the interest on the owners' investment, and a profit to the owner. To put these owners in the same position, in 1946, as if they had not been the owners, until that time, required that they give back to the Government these amounts which they had received only on account of their ownership. Such was the purpose of section 9(b) (6).

Our question is whether $138,624.33 of the $228,552.55 which the Government paid the plaintiff in 1945 as "an amount equal to fifteen days' full charter hire" of the tankers, was a payment which falls within the purpose and intent of section 9(b) (6).

The several provisions of the redelivery agreement which we have summarized or quoted above show that the parties were negotiating a compromise which would get the Government out of the ship repair and conversion business and get the owners in possession of their ships in a lucrative shipping market. The Government would have been oblig-

ed, under the 1936 Act and the charter agreement, to restore the ships "on its time", that is, to pay charter hire for the time it spent in restoring them, regardless of how long it took. The fifteen days' time used as a basis of calculation in the redelivery agreement was, of course, only an approximation. It would have been no worse for that, if it could be fairly said that the parties agreed upon this approximation, and the amount of charter hire which it would produce, as a really distinct item in their compromise. It would seem apparent, however, that the different items in the compromise settlement were of little importance to the parties. The important thing was the total amount which the Government was agreeing to pay to the plaintiff. If that amount had been arrived at by specifying twice as long a period to be computed at charter hire rates, and reducing the estimated restoration costs so as to produce the same total figure, that would have been a matter of indifference to the plaintiff and, it would seem, to Maritime. The itemization was largely a gesture in the direction of the provisions of the Merchant Marine Act of 1936, supra, and its provisions about the redelivery of ships requisitioned for use.

We have quoted above the express statement in the redelivery agreement that "it is the fact and intention of the parties that this lump sum settlement is not in payment of articles or services, but is in discharge of certain claims under the charter." We recognize that this provision was inserted for the special purpose of foreclosing further renegotiation of possibly asserted excess profits, and that it is not entitled to great weight in resolving our problem.

The question before us is difficult, and we are by no means certain that our conclusion is right. That conclusion is, however, that in view of the nature of the compromise embodied in the redelivery agreement, no definable part of the money paid by the Government to the plaintiff pursuant to that agreement can be said to have been paid as charter hire for use of the vessel, within the meaning of section 9(b) (6).

The plaintiff is entitled to a judgment for $138,624.33 less an uncontested offset, without interest, of $55,449.73 in favor of the defendant. The net amount of the judgment is, therefore, $83,174.60.

It is so ordered.

JONES, Chief Judge, and DURFEE, Judge, concur.

LARAMORE, Judge (dissenting).

I cannot agree with the opinion of the majority.

In my opinion, the sum of $138,624.33 was paid to the plaintiff for the "use" of the vessels as that word is used in section 9(b) (6) of the Merchant Ship Sales Act of 1946. Under its charter with the plaintiff, the defendant was obligated to restore the tankers "on its time." Instead of fulfilling this obligation to restore the tankers, the defendant paid the plaintiff a sum which represented the cost of this restoration and, in addition, it paid "charter hire" for 15 days which represented defendant's duty to restore the vessels "on its time." It is true that the sum was paid in lieu of defendant's duty to hire the vessels, but it was paid only because such a duty existed.

Section 9(b) (6) of the Act states that "the applicant shall credit the Commission with all amounts paid by the United States to him as charter hire for the use of the vessel * * *." As the majority points out, this provision forced wartime purchasers who had chartered their ships to the Government to credit the Government with amounts which had previously been paid them only on account of their ownership since the "use" portion of the charter hire was paid for depreciation, interest on the owners' investment, etc. The $138,624.33, here in question, which was paid the plaintiff by the defendant, represented the "use" portion of 15 days of charter hire under the charter. It was paid plaintiff in lieu of the "use" of vessels, but it was paid because the de-

fendant was under a contractual obligation to pay for the "use of the vessel[s]" during the period of restoration.

To effectuate the clear policy expressed in section 9(b) (6), it seems a necessity to credit this amount to the Government. The sum represents an amount which was paid on account of ownership. To allow plaintiff to avoid crediting this amount would give it an advantage not contemplated by the statute.

WHITAKER, Judge, joins in the foregoing dissenting opinion.